IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| ROBERT HOWELL, ) | Civil Action No.: 4:07-cv-230-TLW-TER |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs ) | |
| ) | REPORT AND RECOMMENDATION |
| M. PETTIFORD, WARDEN; ) | |
| LUIS BERRIOS, CLINICAL DIRECTOR; ) | |
| and JULIA BERRIOS, MEDICAL ) | |
| DIRECTOR ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## I.  PROCEDURAL BACKGROUND

The plaintiff, Robert Howell ("plaintiff/Howell"), filed this action under 42 U.S.C. § 1983[1] on January 23, 2007. At all times relevant to the allegations in the plaintiff's complaint, he was an inmate at the Federal Correctional Institution, Bennettsville, South Carolina. Plaintiff alleges that his constitutional rights were violated due to medical indifference. On August 29, 2007, defendants filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure along with a memorandum and exhibits in support of that motion (document #18). Because the plaintiff is proceeding pro se, he was advised on or about September 6, 2007, pursuant to Roseboro

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d),DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the district judge.

v. Garrison, 528 F.2d 309 (4th. Cir. 1975), that a failure to respond to the defendants' motion for summary judgment with additional evidence or counter affidavits could result in dismissal of his complaint. The plaintiff filed a response in opposition on October 4, 2007.

## II.  DISCUSSION

### A.  ARGUMENT OF PARTIES/ FACTUAL ALLEGATIONS

The plaintiff alleges that his constitutional rights were violated due to a deliberate indifference to his medical needs. Specifically, plaintiff alleges that defendants Dr. Luis Berrios and Dr. Julia Berrios changed his anti-seizure medications from Klonopin (Clonazepam) to Keppra (Levetiracetum) which has caused him to have several seizures. Plaintiff asserts that because defendant Pettiford is the warden and supervises the two physicians, he should have directed them not to change his medication and had them provide him with Klonopis (Clonzaepam). In his complaint, plaintiff alleges that all three defendants know that he suffers with epileptic seizures and that the two physicians knew that administering Klonopin or its generic equivalent Clonazepam previously controlled the frequency of the seizures and knew that this medicine did not cause him to suffer with any side effects. Plaintiff alleges that both Doctors attempted to control his seizures by administering Keppra "because the central office would not approve the continued use of Klonopin or Clonazepam in my case. . ." and that the Keppra does not control his seizures. Plaintiff alleges that he has fallen several times while having the seizures and has "suffered a minor stroke while in the grip of a seizure."(Complaint). Further, plaintiff asserts that defendants Luis Burrios and Julia Berrios are aware that he suffers with detrimental side effects, "specifically constant nausea and frequent dizziness and occasional disorientation from the use of Keppra." (Complaint). Plaintiff

2

alleges that both doctors refuse to discontinue the use of Keppra and resume using Klonopin or Clonazepam and that defendant Warden Pettiford has actively refused to direct them to change his medication.

Plaintiff requests injunctive relief by way of a temporary restraining order "enjoining the defendants to resume the proven-successful treatment of my seizures with Klonapin/Clonazepam." Plaintiff also requests that the court "permanently enjoin the defendants to resume treating my seizures with Klonapin/Clonazepam unless there is demonstrated some compelling medical justification for doing otherwise." (Complaint).

## B. STANDARD FOR SUMMARY JUDGMENT

A federal court must liberally construe pleadings filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972), and Haines v. Kerner, 404 U.S. 519 (1972). In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Department of Social Services, 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c). The movant has the burden of proving that a judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing that there is a genuine issue for trial." The opposing party may not rest on the mere assertions contained in the pleadings. Fed. R. Civ. P. 56(e) and Celotex v. Catrett, 477 U.S.

317 (1986).

The Federal Rules of Civil Procedure encourage the entry of summary judgment where both parties have had ample opportunity to explore the merits of their cases and examination of the case makes it clear that one party has failed to establish the existence of an essential element in the case, on which that party will bear the burden of proof at trial. See Fed. R. Civ. P. 56(c). Where the movant can show a complete failure of proof concerning an essential element of the non-moving party's case, all other facts become immaterial because there can be "no genuine issue of material fact." In the Celotex case, the court held that defendants were "entitled to judgment as a matter of law" under Rule 56(c) because the plaintiff failed to make a sufficient showing on essential elements of his case with respect to which he has the burden of proof. Celotex, 477 U.S. at 322-323.

### C.  SOVEREIGN IMMUNITY

As previously discussed, plaintiff alleges that defendants refuse to administer the seizure medication, Klonopin or Clonazepam, which effectively works to control his seizures but instead, continue to administer Keppra which does not control the seizures and causes him to suffer side effects.

Defendants state that all defendants are employed by FCI Bennettsville with Dr. Luis Berrios being the Clinical Director and Dr. Julia Berrios being the medical officer.

Defendants assert that by naming the employees, he is actually bringing suit against the United States under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). Defendants argue that plaintiff's allegations stem from assertions that defendants have a duty to provide him with proper and adequate medical care which stems from their

4

employment, not from any personal obligation of the defendants. Thus, defendants assert that the doctrine of sovereign immunity shields the United States from suit absent its consent to be sued. As the United States has not consented to be sued, defendants argue the courts lack jurisdiction over plaintiff's claims against the defendants in their official capacities.

Suits against federal officials may not be brought under § 1983. District of Columbia v. Carter, 409 U.S. 418, 424-25 (1973). Federal courts have power under 28 U.S.C. § 1331 (1994) to award damages occasioned by infringements by federal officials of constitutionally protected interests. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971); see Radin v. United States, 699 F.2d 681, 684 (4th Cir. 1983) (Bivens recognized an action against federal officers sued in individual capacities, but not against the United States). Plaintiff's Bivens action cannot lie against the United States nor against the individual defendants in their official capacities. *See* United States v. Mitchell, 463 U.S. 206, 212 (1983) (the United States cannot be sued without its express consent.); Radin v. United States, 699 F.2d 681, 685 (4th Cir.1983); Keene Corp. v. United States, 700 F.2d 836, 845 n. 13 (2d Cir.1983) (*Bivens* does not allow for recovery of money damages, or suits in general, against the government itself.). Thus, to the extent defendants are being sued under Bivens in their official capacities, the claims are barred by the doctrine of sovereign immunity. Sovereign immunity does not bar damage actions against federal officials in their individual capacities for violation of an individual's constitutional rights. Gilbert v. Da Grossa, 756 F.2d 1455, 1459 (citing Davis v. Passman, 442 U.S. 228(1979); Bivens, supra. Thus, to the extent defendants are being sued in their individual capacities under Bivens, plaintiff's claims are not barred by the doctrine of sovereign immunity.

## D. MEDICAL INDIFFERENCE

Defendants assert that plaintiff arrived at FCI Bennetsville on October 2, 2005, and was evaluated as part of the intake screening where it was noted he was taking Clonazepam among other medications. Defendants submitted portions of the chronological record of medical care for plaintiff as Exhibit C. Defendants assert that these records reveal that Dr. Julia Berrios examined plaintiff on October 12, 2005, where she assigned him to the Chronic Care Clinic for Neurology and Mental Health due to his psychotropic medications and history. Defendants contend that Dr. Julia Berrios directed that plaintiff be assigned to a lower bunk as a precaution and, shortly thereafter, directed that he be housed on a lower floor housing area. Defendants also attached a copy of the BOP's Program Statement 6360.01, Pharmacy Services, p. 5-6 as Exhibit D and the BOP Formulary as Exhibit E. Defendants state that the BOP has a formulary for medications that are routinely prescribed throughout the prison facilities and the Clonazepam is a DEA Schedule IV drug listed on the formulary, but its use is restricted to limited periods of time and situations. Defendants point out that the BOP Formulary reveals that one consideration for the use of the medication is after "failure of standard modalities for seizure disorder" and is the 4th line therapy. (Id., p.16). Defendants assert that based on the Program Statement, approval from the Chief Pharmacist and Medical Director are required to initiate or continue its use. (Exhibit D, p.5 and Exhibit E, p. 16-18).

Defendants assert that Dr. J. Berrios made a written request to Washington D.C. for approval to continue treatment with Clonazepam, and the Chief Pharmacist determined that treatment with this medication was not appropriate, as there were several other anti-seizure medications available that could treat his symptoms with much less significant side-effects. (Def. Exhibit F, Non-formulary Drug authorization dated November 14, 2005). Defendants contend that Dr. J. Berrios spoke with

6

staff in the Chief Pharamist's office to discuss the appropriate method for ending prior treatment, as it can be dangerous to simply stop taking Clonazepam. (Id.). The Chief Pharmacist and Medical Director approved treatment only temporarily with Clonazepam for the purpose of weaning the patient off that medication and beginning treatment with other drugs. (Id.).

Defendants assert that plaintiff did not appear for his Chronic Care appointment on January 20, 2006, and the appointment was rescheduled for January 25, 2006, when he was seen by Dr. J. Berrios. On that date, Dr. J. Berrios explained that the Klonopin or Clonazepam would be discontinued over several weeks while plaintiff was started on Keppra. (Id.) Defendants assert the pharmacy was made aware of this change and implemented it.

Defendants set out a detailed medical history regarding plaintiff's seizures and medications in their memorandum and attaching the exhibits supporting that history. This detailed medical history as set forth by the respondent is cited herein:

> Each inmate who receives controlled medication, such as the various anti-seizure and psychotropic medications prescribed for Mr. Howell, must obtain them during the pill line. This requires the inmate to appear and ingest the medications in front of medical staff, to ensure the medication is used properly and is not hoarded. (Exhibit E, p. 18 - 19). Staff initial the Medical Administration Record whenever a dosage is dispensed. Missed dosages due to the patient's failure to appear are denoted by empty spaces next to the dispensing time or by the initials "NS." (Id. and Exhibit G, generally). Notations as to refused dosages are denoted by the letter "R." (Exhibit G, generally).
>
> On February 6, 2006, medical staff were called to Mr. Howell's housing unit, where the clinician discovered Howell lying on the floor. (See Exhibit C, p. 7). He appeared to have previously suffered a seizure. (Id.). After insuring there were no lasting effects, Plaintiff was referred to the physician and was advised to contact medical staff as needed. (Id.).
>
> The previously ordered medication changes were being implemented,

with Mr. Howell being weaned from the Klonopin (Clonazepam) and his dosages of Keppra (Levetiracetam) increased. (Exhibit G, p. 6). Records reflect that on February 11, 2006, Mr. Howell began to refuse to take the entire dose of Keppra (Levetiracetam) as prescribed, taking only half of the dosage most of the time. (Id.). Despite his assertions to the contrary, there is no indication that Mr. Howell suffered any seizure on February 12, 2006. (See Exhibit C, pp. 7 - 8, and Exhibit H, Unit Log for relevant period, pp. 1- 2).

Mr. Howell did not appear for his lab results and evaluation by the physician on February 23, 2006. (See Exhibit C, p. 8). The next day, Mr. Howell was brought to the medical unit from the Recreation area, complaining that he felt dizzy and nauseated, which he stated was how he felt before he had a seizure. (See Exhibit C, p. 8). He was examined by Dr. Luis Berrios, who saw no physical evidence of seizure activity. (Id.). When questioned by Dr. L. Berrios, Mr. Howell admitted he was not taking the medications as directed, taking only ½ the dosage of Keppra (Levetiracetam) that was prescribed, stating it made him feel dizzy. (Id.). Dr. L. Berrios modified the dosage schedule in an attempt to counter act the side effect Mr. Howell complained of (for the first time since starting the medication). (Id. and Exhibit G, p. 6). Dr. L. Berrios explained the need to take the medications as directed, and in the dosages directed. (Exhibit C, p. 8). Mr. Howell stated he understood. (Id.). He was directed to return to the clinic as needed or on his Chronic Care appointment. (Id.)

Mr. Howell was in the medical unit on March 7, 2006, to obtain copies of his medical records. (Exhibit C, p. 9). He continued to appear for his medications on a daily basis, but only rarely appeared at the pill line to take the Keppra (Levetiracetam) at noon as ordered. ( Exhibit G, pp. 6 - 7). He made no complaints to medical staff about his condition. (Exhibit C, generally, pp. 8 - 10).

On March 8, 2006, Mr. Howell was taken to the medical unit from Food Service due to a possible seizure. (Exhibit C, p. 10). He was complaining of dizziness and nausea and lay down on the floor although he was alert and oriented. (Id.). He was examined by Dr. L. Berrios, who saw no physical evidence of seizure activity. (Id.). Dr. L. Berrios added Tegratol (carbamazepine) to Mr. Howell's medications, to help in controlling the possible seizures. (Id.). Dr. L. Berrios explained the need to take the medications in combination as directed and to watch his diet and exercise, all of which in combination can control the seizures. (Id.). Mr. Howell indicated he

understood. (Id.). Mr. Howell was directed to followup in the clinic as needed or at his next Chronic Care appointment. (Id.). The changes were made by the pharmacist as directed by Dr. L. Berrios. (Exhibit G, p. 7). Mr. Howell took three doses of the Tegretol (Carbamazepine) and then began to refuse (the letter "R" indicates "refused") the medication. (Id.). He continued to only take part of the Keppra (Levetiracetam) as directed. (Id.).

On March 27, 2006, Mr. Howell was discovered by the unit officer lying on the floor shaking. (Exhibit H, p. 3, and Exhibit C, p. 11). The officer called for medical assistance. (Id.). Physician Assistant Hansen responded to the unit, where he saw Mr. Howell lying on the floor in rescue position. (Exhibit C, p. 11). Mr. Howell was responsive to inquiry. (Id.). He was transported to the medical unit for examination. (Id.). There, the PA attempted to give him Tegretol, however, Mr. Howell refused. (Id. and Exhibit I, Refusal of Treatment form). He was provided Motrin and referred to the physician for follow-up. (Id.).

On March 28, 2006, Mr. Howell saw Dr. L. Berrios to discuss his medications. (Exhibit C, p. 12). Mr. Howell stated that the Tegretol (Carbamazepine) made him dizzy. (Id.). After examination, Dr. L. Berrios modified Mr. Howell's prescriptions, discontinuing the Tegretol 10 (carbamazepine) and placing him on a slowly increasing dosage of Topamax (Topiramate). (Id. and Exhibit G, pp. 7 - 9). Dr. L. Berrios reiterated the need to take these anti-seizure medications as directed. (Exhibit C, p. 12). The change was made by the pharmacist. (Id. and Exhibit G, pp. 7 - 9). Although Mr. Howell took the Topiramate as directed, he continued to refuse to take the Keppra (Levetiracetam) as often as directed. On April 12, 2006, Mr. Howell did not take any of his morning medications. (Exhibit G, p. 8).

On April 14, 2006, the correctional officer in the housing unit called for medical assistance because Mr. Howell appeared to be having a seizure. (Exhibit H, p. 4 and Exhibit C, p. 13). PA Hansen responded to the housing unit and found Mr. Howell in the rescue position, responsive to query and able to walk. (Exhibit C, p. 13). He was taken to the medical unit, where he was examined by Dr. J. Berrios, with no abnormal findings. (Id.).

Mr. Howell was next examined by Dr. L. Berrios on April 27, 2006, during the Chronic Care Clinic. (Exhibit C, pp. 13 - 14). His medications were continued with a small change not impacting his

seizure treatment, (Exhibit G, pp. 7 - 8), and he was directed to return to the clinic in three months. (Exhibit C, p. 14).

On May 23, 2006, correctional staff called for medical assistance in the housing unit, as Mr. Howell claimed to have a seizure. (Exhibit H, p. 5). Nurse L. Everett was called to the housing unit where she found Mr. Howell lying on blankets on the floor, claiming to have suffered a seizure. (Exhibit C, p. 15). No staff witnessed the incident. (Id.). Mr. Howell was transported to the medical unit for evaluation and Dr. J. Berrios was notified. (Id.). Mr. Howell was alert and talkative. (Id.). He requested and was given Motrin for his headache, along with his regularly scheduled evening medications. (Id.). He left the area without problems, with direction to return to his unit to rest. (Id.).

Mr. Howell had no further medical complaints, continued to take his medications daily, with the exception of the Keppra (Levetiracetam), which he only took twice instead of three times daily as prescribed. (Exhibit G, p. 10 and Exhibit C, pp. 15 - 16). He was next seen in the Chronic Care Clinic by Dr. L. Berrios on July 27, 2006. (Exhibit C, p. 16 - 17). He indicated he was doing well and had no complaints other than a muscle strain. (Id.). He stated he had no seizures. (Id.). His medications were continued as prescribed, with the addition of a pain reliever (Naproxen) for a short time. (Id.).

Medical staff were called to the housing unit on August 1, 2006, because Mr. Howell claimed to have suffered a seizure. (Exhibit H, p. 6, and Exhibit C, p. 17). He was evaluated on site by PA Hansen, who found him to be alert and able to ambulate. (Exhibit C, p. 17). Mr. Howell was transported to the medical unit where he was evaluated further. (Id.). The PA discussed the situation with Dr. J. Berrios. (Id.). Mr. Howell complained of a headache (for which he was provided Motrin as well as vitamin B6) and some numbness on the left side of his face. (Id.). He was directed to return to the medical unit as needed. (Id.).

Plaintiff returned to the medical unit on August 8, 2006, complaining that the numbness in his face had not dissipated. (Exhibit C, p. 18). He was seen by Dr. L. Berrios, who found upon examination that Mr. Howell's left pupil was dilated. (Id.). Dr. L. Berrios ordered an immediate trip to the local hospital where Mr. Howell underwent a CT scan and evaluation by a neurologist. (Exhibit C, p. 18, and Exhibit J, Consultation Sheet). The CT scan was normal. (Exhibit K,

CT Scan report). The neurologist recommended adding Plavix[7] (clopidogrel) to the patient's medications. (Exhibit C, p. 19). This was done the same day. (Id.).

Dr. L. Berrios saw Mr. Howell two days later to monitor his condition. ((Exhibit C, p. 19). Mr. Howell indicated he was taking the Plavix as directed without complications. (Id.). Dr. L. Berrios prepared a consultation request to have Mr. Howell seen by the neurologist again in followup. (Exhibit L, Consultation Sheet).

On August 21, 1006, Mr. Howell appeared in the medical unit wanting to see a doctor about his seizure medications. (Exhibit C, p. 19). He told the nurse that he had no recent seizure activities but wanted to speak to a doctor. (Id.) He was referred to the physician . (Id.). On August 24, 2006, the Medical Utilization Review Committee ("URC") reviewed the request for a neurology consult. (Id. and Exhibit M, relevant portions of Program Statement 6031.01 "Patient Care", pp. 6 - 8). Given the nature of the requested tests, the request was forwarded to the Region for evaluation by the Regional Speciality Clinical Consultant. (Exhibit C, p. 19 and Exhibit M, p. 8).

Although he picked up his pill line medications on a regular basis (except for his noontime dosage of Keppra (Levetiracetam), plaintiff had no further contact with medical staff until October 11, 2006. (Exhibit C, p. 19 - 20). He did not make any complaints of pain or seizures during that time. (Id.).

On October 11, 2006, medical staff were called to Unit C-2 where Mr. Howell was reportedly having a seizure. (Exhibit H, p. 7, and Exhibit C, p. 20). Dr. J. Berrios responded to the call. (Exhibit C, p. 20). Upon arrival, Dr. J. Berrios found Mr. Howell lying on the floor on two pillows. (Id.). He was awake and oriented. (Id.). Examination revealed no physical signs of a seizure and no evidence that he had fallen. (Id.). There were no witnesses to the alleged seizure episode. (Id.). There was no evidence of a postictal state (altered consciousness common after an epileptic seizure). (Id.). Mr. Howell refused to go to the medical unit for further evaluation. (Id. pp. 20 - 21). He was provided Motrin for his joint pain and remained in the housing unit. (Id.).

Although he had contact with medical staff for other reasons, Mr. Howell was not seen again concerning his seizure disorder until December 26, 2006, . . .  (Exhibit C, p.. 22 - 25). He was given an

appointment to see the doctor the following day. (Id., p. 25). On December 27, 2006, Mr. Howell was seen by Dr. J. Berrios for his medication refill. (Id., pp. 26 - 27). His prescriptions were renewed for another six months. (Id.).

Mr. Howell had no complaints to medical staff until January 31, 2007. (Exhibit C, p.. 27 - 28). On that date, medical staff were called to C-2 Unit where they found Mr. Howell lying on his left side with a blanket under his head. (Exhibit C, p. 28). He responded slowly to questioning. (Id.). He reported that he was "feeling bad and getting dizzy" so he lay down on the floor. (Id.). He was transported to the medical unit for further evaluation. (Id.). No physical evidence of a seizure or a fall were present. (Id.). Mr. Howell complained of a headache. (Id.). The nurse contacted Dr. L. Berrios, who prescribed Motrin (600 mg) for the headache pain. (Id.). Mr. Howell was given the medication and released to his housing unit. (Id.).

On March 30, 2007, Mr. Howell was examined by a consultant neurologist. (Exhibit L). The neurologist recommended several tests, including and ECHO, carotid ultrasound and a MRI of the brain. (Id., and Exhibit C, p. 29). He also recommended increasing the Keppra (Levetiracetam) to 1500 mg twice a day and continuing with the Topamax (Topiramate). (Id.). He suggested considering Depakote and video EEG monitoring. (Id.). The request for ECHO, carotid ultrasound and brain MRI were forwarded to the Regional Specialty Clinical Consultant for review. (Exhibit C, p. 29). Plaintiff was scheduled for an appointment with Dr. L. Berrios to discuss the neurologist's recommendations and their plan, however, he did not appear for that appointment. (Id.).

Mr. Howell did appear for his Chronic Care appointment with Dr. J. Berrios on April 17, 2007. (Exhibit C, pp. 30 - 31). He had no complaints about his medication and indicated he had no seizure episodes. (Id.). Dr. J. Berrios made the changes to plaintiff's Keppra (Levetiracetam) dosage as recommended by the neurologist. (Id.).

Plaintiff had no complaints in May or June 2007 regarding seizures or his medication, although he was seen several times for an unrelated issue. (Exhibit C, pp. 31 - 33). On July 5, 2007, plaintiff was transported to the local hospital for the brain MRI and carotid ultrasound. (Exhibit C, p. 33 and Exhibit N, Report of MRI, and Exhibit O, Report of Carotid Ultrasound). The findings of these tests was normal. (Id.). There have been no further seizures or reports of

12

>problems with medication. (Exhibit C, p. 34).

Based on the evidence, the undersigned finds that the plaintiff fails to show that defendant was deliberately indifferent to his medical needs. In the case of Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court reviewed the Eighth Amendment prohibition of punishments which "involve the unnecessary and wanton infliction of pain," Id., quoting Gregg v. Georgia, 428 U.S. 153, 169-73 (1976).  The court stated:

>An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. . . .  We therefore conclude that deliberate indifference to serious medical needs of a prisoner constitutes the "unnecessary and wanton infliction of pain," Gregg v. Georgia, supra, at 173, (joint opinion), proscribed by the Eighth Amendment.  This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

Estelle, 429 U.S. at 103-105. (Footnotes omitted).

Despite finding that "deliberate indifference to serious medical needs" was unconstitutional, the court was careful to note, however, that "an inadvertent failure to provide adequate medical care" does not meet the standard necessary to allege an Eighth Amendment violation:

>. . . a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Estelle, 429 U.S. at 107.

The Court of Appeals for the Fourth Circuit has also considered this issue in the case of Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990). In that case, the court noted that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness (citation omitted), . . . nevertheless, mere negligence or malpractice does not violate the Eighth Amendment." Id. at 851. Unless medical needs were serious or life threatening, and the defendant was deliberately and intentionally indifferent to those needs of which he was aware at the time, the plaintiff may not prevail. Estelle, supra; Farmer v. Brennan, 511 U.S. 825 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986).

Further, incorrect medical treatment, such as an incorrect diagnosis, is not actionable under 42 U.S.C. § 1983. Estelle v. Gamble, supra. Negligence, in general, is not actionable under 42 U.S.C. § 1983. See Daniels v. Williams, 474 U.S. 327, 328-36 & n. 3 (1986); Davidson v. Cannon, 474 U.S. 344, 345-48 (1986); Ruefly v. Landon, 825 F.2d 792, 793-94 (4th Cir.1987); and Pink v. Lester, 52 F.3d 73, 78 (4th Cir. 1995) (applying Daniels vs. Williams and Ruefly v. Landon: "The district court properly held that Daniels bars an action under § 1983 for negligent conduct."). Secondly, 42 U.S.C. § 1983 does not impose liability for violations of duties of care arising under state law. DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 200-03 (1989). Similarly, medical malpractice is not actionable under 42 U.S.C. § 1983. Estelle v. Gamble, supra, at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.") See also Brooks v. Celeste, F. 3d 125 (6th Cir. 1994) (Although several courts prior to the Supreme Court's decision in Farmer v. Brennan, supra, held that "repeated acts of negligence could by themselves constitute deliberate indifference, Farmer teaches otherwise."); Sellers v. Henman, 41 F.3d 1100, 1103 (7th Cir. 1994) ("If act A committed by the X prison shows

14

negligence but not deliberate indifference, and B the same, and likewise C, the prison is not guilty of deliberate indifference."); White v. Napoleon, 897 F.2d 103, 108-109 (3rd Cir. 1990); and Smart v. Villar, 547 F.2d 114 (10th Cir. 1976) (affirming summary dismissal).

Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice." Jackson v. Fair, 846 F. 2d 811, 817 (1st Cir. 1988). Although the provision of medical care by prison officials is not discretionary, the type and amount of medical care is discretionary. See Brown v. Thompson, 868 F. Supp. 326 (S.D.Ga. 1994). Further, a disagreement as to the proper treatment to be received does not in and of itself state a constitutional violation. See Smart v. Villar, 547 F. 2d 112 (10th Cir. 1976); Lamb v. Maschner, 633 F. Supp. 351, 353 (D.Kan. 1986). Mistakes of medical judgment are not subject to judicial review in a § 1983 action. Russell v. Sheffer, 528 F. 2d 318, 319 (4th Cir. 1975).

The plaintiff has failed to show that he was denied medical treatment. Although plaintiff alleges in his complaint that upon entering FCI Bennettsville he was on one type of seizure medication which was changed to another less effective medication, he was treated and examined by medical on several occasions and underwent examination and testing by an outside neurologist. Even plaintiff alleged in his complaint that both Doctors attempted to control his seizures by administering Keppra "because the central office would not approve the continued use of Klonopin or Clonazepam in my case. . ." (Paragraph 10). As held in Estelle, 429 U.S. at 107, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Even if plaintiff's allegations are true, he has shown nothing more than a disagreement with the medical treatment provided, not that he was

completely denied medical treatment. Additionally, plaintiff has failed to show that he had a serious medical need of which defendant knew about and consciously ignored. Plaintiff has not shown that any conduct by these defendants "shocks the conscious" as required by Miltier v. Beorn, supra. "Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice" Jackson v. Fair, supra. The type and amount of medical care is left to the discretion of prison officials as long as medical care is provided. Brown v. Thompson, supra. Any disagreement between an inmate and medical personnel fails to state a claim unless exceptional circumstances are alleged . . . Although there is nothing to indicate that there were mistakes of medical judgment, even if shown, mistakes of medical judgement are not subject to judicial review in a § 1983 action. Russell v.Sheffer, supra.

Based on the evidence presented, there has been no deliberate indifference shown to the overall medical needs of the plaintiff.

### E. RESTRAINING ORDER

In the relief portion of his complaint, plaintiff requests a temporary restraining order enjoining the defendants to resume giving him Klonapin/Clonazepam for his seizures. By plaintiff requesting a Temporary Restraining Order, he is seeking injunctive relief. The Court should consider and balance four factors in determining whether to grant injunctive relief prior to a trial on the merits:

> (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if the interim relief is denied; (c) the injury to defendants if an injunction is issued; and (d) the public interest.

North Carolina State Ports Auth. v. Dart Containerline Co. Ltd., 592 F.2d 749 (4th Cir. 1979) See also Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir. 1977); Fort Sumter Tours, Inc. v. Andrus, 564 F.2d 1119 (4th Cir. 1977). However, preliminary relief directed to running a state prison should be granted only in compelling circumstances. Taylor v. Freeman, 34 F.3d 266, 269 (4th Cir. 1994).

The two most important factors are probable irreparable injury to the plaintiff if the relief is not granted and the likelihood of harm to the defendants if the injunction is granted. North Carolina State Ports Authority v. Dart Containerline Co., Ltd., 592 F.2d at 750.

To satisfy case or controversy requirement of Article III, plaintiff must show a personal threat of ongoing or future harm, the likelihood that the wrongful behavior will occur or continue, and that the threatened injury is impending. Friends of the Earth, Inc. v. Laidlaw Environmental Servs., 528 U.S. 167, 190 (2000); see also City of Los Angeles v. Lyons, 461 U.S.95, 101-102 (1983) (plaintiff must face real and immediate threat of future injury).

Plaintiff does not have an automatic right to a preliminary injunction, and such relief should be used sparingly. The primary purpose of injunctive relief is to preserve the status quo pending a resolution on the merits. Injunctive relief which changes the status quo pending trial is limited to cases where "the exigencies of the situation demand such relief." Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980).

As noted, the courts are directed to leave prison administration to the discretion of those best suited to running the prisons. Granting plaintiff injunctive relief would have the effect of allowing a prisoner to "approve" actions taken by the prison administration that might have an impact on them, because any attempt to require his compliance might be construed (by any of the parties) as

a violation of the order. Importantly, the plaintiff has not shown or provided any evidence that he is currently subject to a real and immediate threat of physical harm. See Los Angeles v. Lyons, 461 U.S. 95 (1983). He is on medication for his seizures, albeit not the medication he requests, and based on the records submitted, has not had any complaints are problems since May or June of 2007. Furthermore, plaintiff submits his own assessment of the best medical treatment without proper evidentiary support. In addition, plaintiff has failed to show a likelihood of success on the merits based on the above analysis there is no constitutional violation for medical indifference. Therefore, it is recommended defendants' motion for summary judgment be granted with respect to this issue.

As to plaintiff's request for a permanent injunction ordering defendants to give him a certain medication for his seizures should also be denied. A permanent injunction resolves the merits of a claim and imposes an equitable remedy because a legal one is inadequate. A plaintiff seeking a permanent injunction must demonstrate that: (1) It has suffered irreparable injury; (2) remedies available at law, such as monetary damages are inadequate to compensate for that injury; (3) considering balance of hardships between plaintiff and defendant, remedy in equity is warranted; and (4) public interest would not be disserved by permanent injunction. Ebay, Inc. V. MercExchange, LLC, 547 U.S. 388 (2006). As with the request for a preliminary injunction discussed above, plaintiff cannot meet this test. Therefore, it is recommended that defendants' motion for summary judgment be granted in regard to this issue.

## SUPERVISORY LIABILITY

Defendants assert that defendant Pettiford. is entitled to summary judgment in that plaintiff cannot maintain an action against him based on a theory of supervisory liability as it is not proper

for defendant Pettiford to direct the type of medical care the defendants doctors should provide to any patient.

There are three elements necessary to establish supervisory liability under §1983: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994). To satisfy the requirements of the first element, a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. Id. *citing* Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984). Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury. Id. A plaintiff may establish deliberate indifference by demonstrating a supervisor's "continued inaction in the face of documented widespread abuses." Id. Causation is established when the plaintiff demonstrates and affirmative causal link between the supervisor's inaction and the harm suffered by the plaintiff. Id. Plaintiff has failed to meet this burden in that he has failed to establish a constitutional violation. Thus, it is recommended that summary judgment be granted for defendant Pettiford on the theory of supervisory liability.

## III. CONCLUSION

Based on the reasons stated above, it is **RECOMMENDED** that the motion filed by the defendants for summary judgment (document #18) be **GRANTED IN ITS ENTIRETY** and that this matter be **DISMISSED** as no constitutional or statutory rights have been violated.

It is **FURTHER RECOMMENDED** that all outstanding motions be deemed **MOOT**.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 30 , 2008
Florence, South Carolina

**The parties' attention is directed to the important information on the attached notice.**